

# The Attorney General of Texas

MARK WHITE
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

1607 Main St., Suite 1400
Dallas, TX. 75201-4709
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1220 Dallas Ave., Suite 202
Houston, TX. 77002-6986
713/650-0666

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

July 30, 1982

Honorable Bill Clayton
Speaker of the House of
   Representatives
Capitol Building
Austin, Texas  78711

Opinion No.  MW-499

Re:  Use of topical ocular pharmaceutical agents by optometrists, and related matters

Dear Speaker Clayton:

You have posed several questions concerning the authority of the Texas State Board of Medical Examiners to promulgate and enforce administrative rules implementing section 3.06(d)(5) of the new Medical Practice Act, article 4495b, V.T.C.S. That subsection deals with the administration by optometrists of topical ocular pharmaceutical agents, which are medicinal drugs applied to surface areas of the eye that produce effects which aid in the examination or treatment of eye diseases or conditions. Your letter to us states:

> On Sunday, February 21, 1982, the Medical Board met and tentatively adopted rules to implement Section 3.06(d)(5).... These proposed rules appear to violate both the letter and the intent of the law, and appear to exceed the Medical Board's rulemaking authority....

Section 3.06(d)(5) reads in part:

> (d)  This Act shall be so construed that:
>
> ....
>
> (5)  (A)  A duly licensed and qualified optometrist may administer topical ocular pharmaceutical agents in the practice of optometry as provided by this subdivision. These pharmaceutical agents may not be used for therapeutic purposes.
>
> (B)  To be entitled to use topical ocular pharmaceutical agents in the practice of optometry, an optometrist must possess a valid standing delegation order that:

(i)   is issued to the optometrist by an area physician licensed to practice medicine in this state; and

(ii) authorizes the use of the pharmaceutical agents authorized by this subdivision.

(C) On request, an optometrist will be issued a standing delegation order described by Paragraph (B) of this subdivision unless the physician acting as a reasonable and prudent physician determines that denial is within the scope of sound medical judgment as it pertains to optometry, or that it is not in the public interest, and the basis for denial shall be given to the requesting optometrist in writing if requested. It is necessary that the physician have knowledge of the requesting optometrist, and if not, then same shall be good cause for denial.

. . . .

(G) A physician who has issued a standing delegation order in compliance with this subdivision is immune from liability in connection with acts performed pursuant to the standing delegation order so long as he has used prudent judgment in the issuance or the continuance of the standing delegation order.

(H) Nothing herein is intended to limit or expand the practice of optometry as defined by law. (Emphasis added).

Among other things, the tentatively adopted administrative rules that you question purport to specify restrictive terms and conditions for standing delegation orders issued by physicians and to prescribe a model form for such orders. The portion of section 3.06(d)(5) that speaks to the role of the Board of Medical Examiners in this process reads:

(D) A standing delegation order issued under this subdivision or a representation of the order will be prominently displayed in the office of the optometrist. The board will prescribe the form of the standing delegation order and the certificate or representation of the order. The standing delegation order, as a minimum, will:

(1)     be in writing, dated and signed by the physician;

(ii)     specify the available topical ocular pharmaceutical agents, including but not limited to topical anesthetics and dilating agents, to be administered in the office; and

(iii)     specify that said agents shall not be used for therapeutic purposes.

(E)   On the complaint of any person or on its own initiative, the board of medical examiners may cancel a standing delegation order issued under this section if it determines that the optometrist possessing the order has violated the standing delegation order or this section.

(F)   Except as provided by Paragraph (E) of this subdivision, a standing delegation order issued under this subdivision remains valid as long as:

(1)     the physician who issued the order is a resident of this state and is licensed to practice medicine in this state;

(ii)     no irregularities are found on annual review; and

(iii)   the order is not canceled for good cause by either party.

Several of your questions concern the application of specific rules to specific situations, but all of them deal with the power of the Board of Medical Examiners to limit or control the discretionary authority of physicians to invest optometrists with privileges respecting the use of such pharmaceutical agents. Before addressing your specific questions, it is necessary to notice the relationship the drugs have to the practice of optometry.

An optometrist who administers topical ocular pharmaceutical agents does not practice optometry when he does so, whether or not he acts under a standing delegation order issued by a physician. The "practice of optometry" is legally defined by the Texas Optometry Act, article 4552-1.02, V.T.C.S., as:

the employment of objective or subjective means, without the use of drugs, for the purpose of ascertaining and measuring the powers of vision of the human eye, and fitting lenses or prisms to

correct or remedy any defect or abnormal condition
of vision. <u>Nothing herein</u> shall be construed to
permit optometrists to treat the eyes for any
defect whatsoever in any manner <u>nor to administer
nor to prescribe any drug</u> or physical treatment
whatsoever, unless such optometrist is a regularly
licensed physician or surgeon under the laws of
this state. (Emphasis added).

Although subsections (A) and (B) of section 3.06(d)(5) of the
Medical Practice Act speak of the use of topical ocular pharmaceutical
agents "in the practice of optometry," section 3.06(d)(5)(H) specifies
that nothing in the act is intended to "limit or expand the practice
of optometry <u>as defined by law</u>." (Emphasis added). Words may be
supplied to a statute in order to give effect to the clear legislative
intent. <u>Sweeny Hospital District v. Carr</u>, 378 S.W.2d 40 (Tex. 1964).
We believe the words, "in the practice of optometry," as used in
subsections (A) and (B) must mean "in <u>connection with</u> the practice of
optometry." (Emphasis added). Otherwise, the section would be
internally inconsistent. One subsection would nullify others. The
legislative intent is made clear, in our opinion, by section
3.06(b)(2), which states that the act does not apply to "duly licensed
optometrists who confine their practice strictly to optometry <u>as
defined by law</u>." (Emphasis added). The disputed provisions of the
act do not allow optometrists to use drugs as an integral part of the
practice of optometry.

The legislature has clearly indicated its intent that the use of
such pharmaceutical agents be regulated when administered by
optometrists in connection with the practice of optometry. Under its
police power, the legislature may place such regulatory power where it
chooses so long as no provision of the constitution is contravened.
See <u>Francisco v. Board of Dental Examiners</u>, 149 S.W.2d 619 (Tex. Civ.
App. - Austin 1941, writ ref'd). See also <u>Trimble v. Texas State
Board of Registration for Professional Engineers</u>, 483 S.W.2d 275 (Tex.
Civ. App. - El Paso 1972, writ ref'd n.r.e.).

Your first two questions are as follows:

1. With regard to the implementation of
section 3.06(d)(5) of the Medical Practice Act, is
the authority of the Medical Board limited to the
two roles specifically stated in section
3.06(d)(5), <u>i.e.</u>, (1) to prescribe the form of the
standing delegation order and the certificate or
representation of the order, and (2) on complaint
of any person or on its own initiative to cancel a
standing delegation order if it determines that
the optometrist possessing the order has violated
the standing delegation order?

2. (a) In performing its function of prescribing the form of the 3.06(d)(5) standing delegation order and its representation, is the authority of the Medical Board limited to prescribing matters of form rather than substantive content?

(b) Beyond the substantive requirements expressly stated in the statute, is the substantive content of a 3.06(d)(5) standing delegation order to be determined solely by the delegating physician and the optometrist?

(c) If the Medical Board may impose requirements on the substantive content of a 3.06(d)(5) delegation, to what extent may they do so? Particularly, may the Medical Board make medical or optometric judgments and impose them upon the delegating physician and the optometrist?

Section 3.06(d)(5) assigns no role in the issuance or cancellation of a standing delegation order to anyone other than the board and individual physicians. To ascertain the authority of the board, we must first consider the extent of authority conferred upon physicians.

Subsection (d)(5)(B)(1) requires that a standing delegation order be issued to an optometrist "by an area physician licensed to practice medicine in this state." Subsection (d)(5)(C) seemingly requires an area physician to issue such an order unless the physician, "acting as a reasonable and prudent physician" determines (1) that denial is within the scope of sound medical judgment as it pertains to optometry, or (2) that it is not in the public interest. Lack of "knowledge" by the physician of the optometrist is also specified as good cause for denial.

Subsection (d)(5)(F) provides that a standing delegation order may be invalidated by the issuing physician only if he moves his residence from the state, surrenders his license, discovers irregularities on annual review, or cancels the order "for good cause." The order can be cancelled by the board only if it determines that the optometrist "has violated the standing delegation order" or section 3.06 of the act. V.T.C.S. art. 4495b, §3.06(d)(5)(E). Also, subsection (d)(5)(G) specifies that an issuing physician is immune from liability for acts performed pursuant to the standing delegation order so long as he has used prudent judgment in its issuance or continuance.

Given its widest scope, the language of section 3.06(d)(5) would empower a physician to authorize an optometrist to administer (for nontherapeutic purposes) any topical ocular pharmeceutical agent to

any person in his office at any time. Moreover, only the issuing physician could effect a cancellation of the order unless a _violation_ of the order as issued by the physician (or a violation of the statutory section) were proved.

We agree with your contention that it was the manifest intent of the legislature to invest individual physicians with broad power of the sort described above. But, in our opinion, such a reading of section 3.06(d)(5) renders it unconstitutional.

By act of an issuing physician, an optometrist may, under the provisions of subsection (d)(5), obtain official permission and a personal right to perform acts on his own account, i.e., without any form of supervision by the physician. The issuing physician is, moreover, statutorily authorized to base his decision to issue or to decline to issue the permitting order on his perception of "the public interest." Thus, the statute in effect authorizes the myriad private physicians in this state to act as licensing agents for the state, granting or withholding such licenses as each deems best for "the public interest."

The scheme of the statute raises serious questions about the constitutionality of delegating such public powers to private individuals who are neither members of the executive branch of government, nor answerable to the public. See Tex. Const. art. I, §2, art. II, §1, art. III, §1; Gerst v. Nixon, 411 S.W.2d 350 (Tex. 1966) (granting of permits is administrative function); Attorney General Opinion H-41 (1973) (control of dentistry by private organization). See also Tex. Const. art. I, §17 (legislative control of privileges). We need not address those questions here, however, because in our opinion the virtually unlimited nature of the discretion placed in the physicians is sufficient to invalidate the statute.

In Bloom v. Texas State Board of Examiners of Psychologists, 492 S.W.2d 460, 462 (Tex. 1973), the Supreme Court of Texas characterized the question before it as:

> whether the Legislature could constitutionally empower an administrative agency to do whatever it 'may' consider in the best interest of the public without regard to statutory standards or published agency rules.

In concluding that the legislature could not do so, the court relied on this quotation from Railroad Commission v. Shell Oil Company, 161 S.W.2d 1022, 1025 (Tex. 1942):

> It is a well-established principle of constitutional law that any statute or ordinance regulating the conduct of a lawful business or industry and authorizing the granting or

> withholding of licenses or permits as the
> designated officials arbitrarily choose, without
> setting forth any guide or standard to govern such
> officials in distinguishing between individuals
> entitled to such permits or licenses and those not
> so entitled, is unconstitutional and void.

Subsection 3.06(d)(5)(C) requires an area physician to issue a standing delegation order unless he determines, "as a reasonable and prudent physician," that denial is either "within the scope of sound medical judgment as it pertains to optometry," or "in the public interest." A requirement that a licensure decision be based on "sound medical judgment" might establish a sufficient statutory standard to avoid invalidity. And the phrase "in the public interest" might furnish an adequate statutory standard in some situations, i.e., as a guide for some administrative agencies. But in our opinion a statutory declaration -- without more -- that licensure decisions are to be made by individual physicians on the basis of their varied personal concepts of "the public interest" clearly does not do so. See Tex. Const. art. III, §1; Bloom v. Texas State Board of Examiners of Psychologists, supra; Railroad Commission v. Shell Oil Company, supra.

In Ex parte Leslie, 223 S.W. 227, 229 (Tex. Crim. App. 1920), the court considered a Live Stock Sanitary Commission rule, proclaimed pursuant to a penal statute, requiring cattle owners to have their cattle dipped unless an agent of the commission deemed it "safe or expedient" to excuse them from doing so. In finding the measure unconstitutional, the court observed that the power of the agents to discriminate between individuals under such a proclamation:

> is required to rest upon no distinction, but
> permits those executing it to select, without
> giving reason therefor, those who shall obey it
> and those who shall be exempted from its penalty.
> No condition is named to which a citizen
> complaining of discrimination can point as
> condemning the action of those executing the law.
> No fact is named in the law or in the proclamation
> which he may establish and urge as a matter of
> right as exempting him from the penalty.

In the situation before us, the legislature has made the administration of topical ocular pharmaceutical agents by optometrists unlawful and fixed a penalty therefor, but provided that individual physicians may use their own discretion in selecting optometrists to be exempted from the penalty. As with the selections made by live stock sanitary commission agents, the power of physicians to discriminate among individuals rests on no distinction. No condition is named to which an optometrist complaining of discrimination can point as condemning the action of those executing the law, nor is any

*fact named which an optometrist may establish and urge as exempting him from the penalty as a matter of right.*

It would be difficult enough for an administrative agency to apply the "in the public interest" standard with any degree of precision. The thousands of physicians in this state can hardly be expected to do so, however, inasmuch as each will inevitably have a separate and probably different concept of what is "in the public interest." Uniformity in the application of the "public interest" standard is, therefore, an impossibility here.

In Railroad Commission v. Shell Oil Company, supra, the Texas Supreme Court observed that an ostensible "prevention of waste" standard was really no standard at all if the same facts could serve in one instance to exempt a person from the general prohibition of the law and to deny exemption to a different person in another instance. Under the statute here, the application of one optometrist for a standing delegation order could be denied by a physician on facts deemed sufficient by that same physician, or another, to support the application of a different optometrist. Statutory delegations of power may not be constitutionally accomplished by language so broad and vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. See Texas Antiquities Committee v. Dallas County Community College District, 554 S.W.2d 924 (Tex. 1977); Spann v. City of Dallas, 235 S.W. 513 (Tex. 1921). See also United Chiropractors of Washington, Inc. v. State, 578 P.2d 38 (Wash. 1978); Blumenthal v. Board of Medical Examiners, 368 P.2d 101 (Cal. 1962) (delegated power must be accompanied by suitable safeguards to guide its use and to protect against its misuse).

Inasmuch as we believe subsection 3.06(d)(5) of the Medical Practice Act is unconstitutional, we conclude that it neither confers authority on the Board of Medical Examiners or individual physicians, nor deprives them of any authority. Your questions are referable to this subsection, and to the extent that they are, they are answered by the foregoing conclusion. But in the interest of clarity we will briefly discuss the remainder of the Medical Practice Act insofar as it relates to the topic at hand.

The invalidity of subsection 3.06(d)(5) in no way diminishes the authority of the Board of Medical Examiners to promulgate rules respecting the practice of medicine and the enforcement of valid provisions of the act. V.T.C.S. art. 4495b, §§1.02(8), 2.09(a), 3.06(d)(1), (2), (3), 5.02(a). See Acts 1981, 67th Leg., 1st C.S., ch. 1, §5 at 1, 36 (severability clause). Cf. Texas State Board of Examiners in Optometry v. Carp, 412 S.W.2d 307 (Tex. 1967). The board has express authority to regulate the use of dangerous drugs by physicians and those acting under the supervision of a physician. V.T.C.S. art. 4495b, §3.08(4)(E), (F), (I); Dotson v. Texas State Board of Medical Examiners, 612 S.W.2d 921 (Tex. 1981); Scott v. Texas

State Board of Medical Examiners, 384 S.W.2d 686 (Tex. 1964). See also V.T.C.S. art. 4495b, §3.06(d)(2), (3), 3.07(1). It is to be noted that under the delegations validly authorized by the Medical Practice Act (unlike those contemplated by subsection 3.06(d)(5)) the delegating physician is not permitted to escape responsibility for the acts of his delegates. Thus, he does not act as a licensing agent for the state in such circumstances inasmuch as he cannot empower his delegates to act on their own account. They are his agents. See Attorney General Opinion MW-275 (1980). Cf. Sparger v. Worley Hospital, Inc., 547 S.W.2d 582 (Tex. 1977); Attorney General Opinion H-1295 (1978).

It should also be noted that the Texas Optometry Act gives optometrists no license to use drugs for any purpose, therapeutic or not, and that optometrists are not among those permitted by the dangerous drug laws to deliver dangerous drugs in their practice. See V.T.C.S. arts. 4476-14, 4476-15, 4552-1.01 et seq. Subsections 3.06(d)(1), (2) and (3) of the Medical Practice Act, however, would permit physicians, "through physicians orders, standing medical orders, standing delegation orders, or other orders where applicable, as the orders are defined by the board [of Medical Examiners]," to authorize optometrists, as agents of the physician, to perform medical acts and to administer dangerous drugs under certain conditions. (Emphasis added).

## S U M M A R Y

Subsection 3.06(d)(5) of article 4495b, the Medical Practice Act of 1981, is unconstitutional.

Very truly yours,

M A R K   W H I T E
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

RICHARD E. GRAY III
Executive Assistant Attorney General

Prepared by Bruce Youngblood
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Jon Bible
Robert Gauss
Rick Gilpin
Jim Moellinger
Bruce Youngblood